SLR:CPK:ESW
F.#2011V01512

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

In re the Seizure of:

ONE BLACK 2005 PORSCHE CAYENNE
S, VEHICLE IDENTIFICATION NUMBER
WP1AB29P05LA65722;

------------------------------X

M-11-716

AFFIDAVIT OF
PETER SURETTE
IN SUPPORT OF AN
APPLICATION FOR
SEIZURE WARRANT

PETER SURETTE, being duly sworn, deposes and says:

1. I am a Special Agent of the Drug Enforcement Administration ("DEA") assigned to a Tactical Division Squad ("TDS") within the New York Field Division ("NYFD").

2. I have participated in numerous investigations of unlawful drug distribution during the course of which I have: (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds and records of narcotics and money laundering transactions have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers and money launderers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education and experience, I have become familiar with: (a) the manner in which controlled substances are illegally acquired, stored and

distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3. This affidavit is submitted in support of the United States' request for a seizure warrant, pursuant to 21 U.S.C. §§ 853(f) and 881(b) for one black 2005 Porsche Cayenne S, vehicle identification number WP1AB29P05LA65722 (the "Porsche"). The Porsche represents property constituting, or derived from proceeds obtained directly or indirectly, from the commission of a narcotics offense and/or property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a narcotics offense and is subject to forfeiture pursuant to 21 U.S.C. §§ 853 and 881.

4. I am familiar with the facts and circumstances of the investigation set forth below through discussions with other agents and officers of the DEA and other law enforcement agents, which includes information provided by a DEA confidential informant, a DEA confidential source, intercepted telephone calls and text messages obtained pursuant to judicially authorized wiretaps, and from my review of records and reports relating to the investigation.[1] Unless otherwise noted, wherever in this affidavit

---

[1] The Confidential Informant ("CI #1") has provided information in this investigation that has proven to be reliable and has been corroborated by independent evidence. CI #1's criminal history includes a conviction for obtaining property by fraud. CI #1 currently has pending New Jersey state narcotics

2

I assert that a statement was made, the information was provided by another DEA agent, or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. I have not included each and every fact I know about this investigation in this affidavit. Rather, I am setting forth herein the facts that are required to establish probable cause for the seizure of the Porsche.

## Facts

5.  Since September 2010, the TDS of the NYFD has been investigating a narcotics distribution ring operating in Staten Island which includes JAMES PASCALE, JAMES WRENN, LOUIS DARPA, DAMIEN MARRERO and others known and unknown. The investigation has revealed that the organization obtains and sells brand-name prescription drugs, including OxyContin and Xanax. Oxycodone, the active ingredient in OxyContin, is a Schedule II controlled substance. Alprazolam, the active ingredient in Xanax, is a

---

charges stemming from a July 2010 arrest. CI #1 hopes to receive a reduction in his/her respective sentences in exchange for his/her respective cooperation.

Schedule IV controlled substance.

9. PASCALE first came to the attention of DEA agents in New York through CI #1 who began cooperating with the DEA in October 2010. CI #1 identified PASCALE as a distributor of OxyContin and Xanax based in Staten Island, New York. CI #1 stated, in sum and substance, that it is his/her understanding that PASCALE obtains the narcotics from friends who obtain prescriptions for brand-name prescription drugs from multiple doctors, fill the prescriptions, and deliver the pills to PASCALE's residence in Staten Island, New York. CI #1 further stated, in sum and substance, that PASCALE sells the narcotics from his residence. This information was corroborated by subsequent events, as explained below.

10. Based on my training, experience and knowledge of this case, I believe that DARPA and MARRERO engage in "doctor shopping," that is, obtaining multiple prescriptions for the same controlled substance by visiting multiple doctors who are not aware of each other. Doctor shopping is a common practice used by prescription pill distribution organizations to maximize the amount of controlled substances they can obtain and distribute.

October 20, 2010

10. On October 20, 2010, at approximately 4:00 p.m., CI #1 advised DEA agents, in sum and substance, that pursuant to their instructions, he/she had negotiated a purchase from PASCALE of 100

4

OxyContin 80mg tablets, for $2,000 ($20 per pill) via text message to PASCALE's cellular telephone.

11. CI #1 advised DEA agents, in sum and substance, that during the negotiation PASCALE requested that CI #1 send him a text message when he/she was 45 minutes away so PASCALE could coordinate with his source to drop off the pills before CI #1 arrived.

12. On the same day, at approximately 4:30 p.m., in anticipation of a monitored narcotics purchase by CI #1 from PASCALE to take place later that day, DEA agents searched CI #1 and CI #1's vehicle for contraband and confirmed that he/she did not possess any contraband.

13. On the same day, at approximately 4:45 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent a text message to PASCALE to advise PASCALE that he/she was 45 minutes away. At the same time, DEA agents established surveillance in the vicinity of 68 Elder Avenue, Staten Island, New York, which is PASCALE's residence.

14. On the same day, at approximately 5:15 p.m., DEA agents provided CI #1 with $2,000 in pre-recorded U.S. currency and a digital audio recorder to record the anticipated narcotics transaction.

15. On the same day, at approximately 5:25 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent another text message to PASCALE to advise PASCALE that

he/she was five minutes away.

16. On the same day, at approximately 5:30 p.m., DEA agents observed that CI #1 was receiving a call from PASCALE's cellular telephone number on his/her cellular telephone. At the same time, DEA agents conducting surveillance of the residence observed a white male, subsequently identified as PASCALE, standing near the front of the residence holding a cellular telephone to his ear. DEA agents directed CI #1 to answer the call. CI #1 answered the call and advised the caller, in sum and substance, that he/she was close by. After CI #1 ended the call, DEA agents conducting surveillance of the residence observed PASCALE remove the cellular telephone from his ear. CI #1 advised agents, in sum and substance, that the person with whom he/she spoke was PASCALE.

17. On the same day, at approximately 5:31 p.m., DEA agents conducting surveillance of the residence observed the Porsche driving on Elder Avenue. The Porsche then parked on the street close to the residence. A white male, subsequently identified as JAMES WRENN, exited the Porsche and walked towards the residence.

18. On the same day, at approximately 5:35 p.m., DEA agents followed CI #1 in CI #1's vehicle to the vicinity of the residence. DEA agents observed CI #1 arrive at the residence at approximately 5:42 p.m., park his/her vehicle in the vicinity of the residence, exit the vehicle and walk toward the basement

apartment of the residence. At approximately 5:43 p.m., DEA agents observed CI #1 walk from the residence back to his/her vehicle, enter the vehicle and depart the area. DEA agents followed CI #1's vehicle to a predetermined meeting location more than a mile away where CI #1 provided the agents with 100 round green pills, identified by agents as 100 OxyContin 80mg tablets, and the digital audio recorder. DEA agents again searched CI #1 and CI #1's vehicle for additional contraband and confirmed that CI #1 did not possess any additional contraband.

19. CI #1 stated, in sum and substance, that he/she walked up to the door of the residence, entered PASCALE's apartment and observed PASCALE, a female he/she recognized as PASCALE's girlfriend and another male inside who he/she recognized from previous narcotics activity with PASCALE. CI #1 further advised DEA agents, in sum and substance, that after greetings were exchanged, CI #1 provided PASCALE with the $2,000 in pre-recorded U.S. currency and in exchange PASCALE gave CI #1 100 OxyContin 80mg tablets. CI #1 further advised DEA agents, in sum and substance, that PASCALE informed CI #1 that he had 120 "blues," meaning 120 OxyContin 30mg tablets (which are blue in color) that he wanted to sell to CI #1. CI #1's information was corroborated by the digital audio recording of the meeting.

20. At approximately 5:52 p.m., DEA agents conducting surveillance of the residence observed PASCALE and WRENN exit the

residence and stand next to the Porsche talking. Shortly thereafter, DEA agents observed WRENN enter the Porsche and depart the area.

May 2, 2011

21. On May 2, 2011, at approximately 3:30 p.m., DEA agents established surveillance in the vicinity of 368 Grantwood Avenue, Staten Island, NY, the residence of Louis DARPA.

22. On the same date, at approximately 4:16 p.m. DARPA placed an outgoing call to MARRERO. The conversation was as follows:

DARPA: "YOU WANNA SWING BY?"
MARRERO: "I CAN'T DO NOTHING FOR YOU RIGHT NOW."
DARPA: "YOU GOT NOTHING?"
MARRERO: "I DO BUT I ONLY GOT THE FIFTEENS. I DON'T HAVE THEM ON ME."
DARPA: "OH, OK."
MARRERO: "YEAH, AS SOON AS I GRAB THEM, WHENEVER, I'LL STOP BY."
DARPA: "ALRIGHT, HOW LONG YOU TAKE?"
MARRERO: "I'M IN THE MIDDLE OF DOING SOMETHING…"
DARPA: "ALRIGHT."
MARRERO: "AND HOUR OR SOMETHING. TOPS."
DARPA: "ALRIGHT. CALL ME."
MARRERO: "ALRIGHT, COOL."

23. On the same date, at approximately 6:33 p.m., DARPA received an incoming call from MARRERO as follows:
MARRERO: "YO, I'M HERE."
DARPA: "COME IN."

24. On the same date, at approximately 6:34 p.m., MARRERO, was observed exiting the Porsche. MARRERO was then observed entering DARPA's residence. At approximately 6:45, MARRERO was observed as he exited DARPA's residence and departed in

8

property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a narcotics offense and is subject to forfeiture pursuant to 21 U.S.C. §§ 853 and 881.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated:    Brooklyn, New York
          July 13, 2011

PETER SURETTE
Special Agent
Drug Enforcement Administration

Sworn to before me this
13 day of July 2011

H~~ON~~. HON. LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

10